```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
2                 WESTERN DIVISION AT DAYTON

3    UNITED STATES OF AMERICA,

4                     Plaintiff,

5        Vs.                    CASE NO. 3:15-cr-28

6    RICHARD SKELTON, II,

7                     Defendant.

8
                  TRANSCRIPT OF PROCEEDINGS
9
                     SENTENCING HEARING
10
     PRESIDING:  THE HONORABLE WALTER H. RICE
11
     DATE:  Thursday, October 29, 2015
12
     APPEARANCES:
13
     For The Plaintiff:
14
     BENJAMIN C. GLASSMAN
15   United States Attorney
     By: Andrew J. Hunt, Esq.
16       Assistant United States Attorney
         200 West Second Street, Suite 600
17       Dayton, Ohio  45402
         937-225-2910
18       Andrew.Hunt@usdoj.gov

19   For The Defendant:

20   DEBORAH L. WILLIAMS
         Federal Public Defender
21   By: Cheryll A. Bennett, Esq.
         1 South Main Street, Suite 490
22       Dayton, Ohio  45402
         937-225-7687
23       Cheryll_Bennett@fd.org

24   Also Present:  Agent James Harris
                    Kimberlee Gray, Investigator
25
```

1    Proceedings recorded by mechanical stenography, transcript
          produced by computer
2

3          Debra Lynn Futrell, Official Court Reporter
                      937-512-1511
4              Debra_Futrell@ohsd.uscourts.gov

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2                          D    X    RD

 3   SCOTT THOMAS KIDD, Psy.D   8   14    74

 4                            - - -

 5                                              Admitted

 6   Government Exhibit 1   Evaluation of Ronald
                            Skelton by Dr. Kidd
 7                          8-13-15 & 8-24-15           82

 8   Defendant's Exhibit A    Rocking Horse Center
                              Records                  84
 9
                            A-1 Records testified to   84
10
     Defendant's Exhibit B   8-13-15 letter to
11                           Ms. Bennett from Mr. Hunt 84

12                            - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Thursday, October 29, 2015

2          IN THE CONFERENCE ROOM

3              10:10 a.m.

4          THE COURT:  We have this morning case CR-3-15-28,

5    United States versus Ronald Skelton.  Andrew Hunt, Amy Smith

6    for the government.  Cheryll Bennett for the Defendant who

7    is here with her estimable investigator Kimberlee Gray.

8          Andrew, you wanted to chat.

9          MR. HUNT:  Yes, Judge, for a couple housekeeping

10   matters.  I guess going forward today, because I haven't

11   done a competency case in front of you before, I assume you

12   want the government to proceed initially to start.

13         THE COURT:  Not necessarily.  My preference --

14         MR. HUNT:  Yes.

15         THE COURT:  -- is to have you say hello to Dr.

16   Kidd, qualify him.  We'll probably stipulate his

17   qualifications, admit his report and then turn it over to

18   Cheryll who I think asked for the hearing and knows what she

19   wants to bring out.

20         MR. HUNT:  Fair enough, Judge.  That's actually

21   the way I'd prefer to do it.

22         The second thing is, my understanding is there's

23   not going to be a request for a second opinion, is that

24   correct?

25         MS. BENNETT:  I don't think there will be, Judge,

1    but I might want to call a witness depending on what Dr.

2    Kidd says today.

3         THE COURT:  Fair enough.  Rather than making

4    Cheryll commit to not asking for a second opinion, let her

5    see what happens today.

6         MR. HUNT:  Yes, sir.

7    Then the third thing is, I may have missed it.

8    Previously we had a conference call I believe in June.  At

9    that time I think the Court made some ends of justice

10   findings.  We didn't have a court reporter at the time.  I

11   think the Court was going to put on a nunc pro tunc or some

12   sort of written order to cover the record.  I wanted to

13   raise that again and make sure we cover that as far as

14   speedy trial is concerned in this matter.

15        THE COURT:  Absolutely.  I will do that before we

16   go into the courtroom.  If I neglected that detail, I

17   apologize.

18        MR. HUNT:  That's not the spirit of the question.

19   I think there was approximately 20 some days left in speedy

20   trial.  I wanted to make sure from the date, basically, of

21   the filing of the motion to today would be waived for

22   purposes of speedy trial.

23        THE COURT:  Not only to today but for a period of

24   time for me to file something.

25        MR. HUNT:  Thank you, sir.

1          THE COURT:  I'll be happy to do that, Andrew.

2     Anything else?

3          MR. HUNT:  No, that's all I had.

4          THE COURT:  Cheryll, anything?

5          MS. BENNETT:  No, your Honor, I'm just going to

6     put on the record we're not going to be raising any issues

7     related to speedy trial just to kind of ease everyone's

8     comfort.  Number 2 is I don't envision that this is going to

9     go to trial.  My main issue for -- I've talked to Andrew

10    about this.  My main purpose in asking for a hearing is not

11    because I necessarily dispute Dr. Kidd's finding, but I

12    believe that his conclusions as to certain issues are

13    erroneous.  I'd like some clarifications on those issues.

14         THE COURT:  Fair enough.  You know exactly what

15    you're looking for which is why Andrew very quickly will

16    hand the ball to you.

17         MS. BENNETT:  Thank you, Judge.

18         THE COURT:  As far as speedy trial is concerned,

19    obviously the period of time from the filing of the motion

20    by Cheryll up through today and for 30 days following today

21    for the purposes of rendering a decision on competency and

22    mental status at the time of the offense is tolled from the

23    running of the Speedy Trial Act.  I make that finding

24    pursuant to 18 United States Code Section 3161 et seq, the

25    Court finding that within the factual and legal confines of

1    this case the ends of justice outweigh the interest of the

2    public and the Defendant in a speedy trial.

3        It shouldn't take me long after I hear the testimony to

4    put on -- or to be ready to put on an entry.  I will ask

5    Cindy, before we finish, to set a date, maybe a week or 10

6    days out for a conference call and at that time, since we're

7    down to, as Andrew indicates, 20 some days, at that time we

8    can determine how we want to proceed.  Andrew, satisfactory?

9            MR. HUNT:  Yes, your Honor, just so I can clarify

10   the record as well too.  There were two motions.  The

11   reference to the motion to continue date, that was

12   originally filed on May 13th.  There was a brief lapse

13   between the hearing on the phone, after the motion to

14   continue was filed, until the filing of the motion for

15   competency.  I think it was a couple days.  For purposes of

16   making the record, it would cover from May 13th to the

17   present plus the days the Court has already identified.

18           THE COURT:  It would indeed.

19           MR. HUNT:  Thank you, sir.

20           THE COURT:  Thank you.  Cheryll, anything?

21           MS. BENNETT:  Nothing further.

22           THE COURT:  Let's do it.  Good enough.

23           (Recess taken at 10:15 a.m.)

24                    IN OPEN COURT

25                    10:19 a.m.

1          THE COURT:  We have this morning case CR-3-15-28,

2     United States of America versus Richard Skelton.  The

3     appearances are now as they were a moment ago in the

4     conference room, save and excepting we are now in open court

5     and the Defendant is present.  Also present is Secret

6     Service Agent James Harris.

7          Mr. Hunt, I'm going to ask you to call your witness for

8     a brief direct examination following which we will proceed

9     with Ms. Bennett's cross.  Cindy has mentioned I gave the

10    Defendant the wrong first name.  It is Ronald rather than

11    Richard.  My apologies.  Doctor.

12                    SCOTT THOMAS KIDD, Psy.D,

13                 having been duly sworn, was

14               examined and testified as follows:

15          THE COURT:  Doctor, good morning and thank

16    you for your time.

17                    DIRECT EXAMINATION

18    BY MR. HUNT:

19    Q.   Sir, could you tell me your name and spell your last

20    name for the record, please.

21    A.   Scott Thomas Kidd.  K-I-D-D.

22    Q.   How are you employed, sir?

23    A.   I'm a clinical psychologist.

24    Q.   What training and education do you have in order to

25    become a clinical psychologist?

1    A.    I have bachelor of arts degree in psychology and

2    criminal justice.  Then I earned my doctoral degree in

3    clinical psychology from Wright State University.

4    Q.    To act as a clinical psychologist, is there any kind of

5    licensure or certification required by the government?

6    A.    Yes, and I'm licensed in the State of Ohio.

7    Q.    Is there any kind of testing or exams or anything of

8    that nature in order to get the licensure?

9    A.    Yes.

10   Q.    Could you briefly describe that, sir?

11   A.    Sure.  There was an oral test and there's also a

12   written test.  Those are done on the same day.  I was

13   licensed September 11th, 2003.

14   Q.    You say you were licensed 2003.  In what capacity have

15   you -- let me restart that question.  What is the nature of

16   what you do since 2003, what kind of work do you have as far

17   as your practice?

18   A.    Sure.  I worked for a few years at Atascadero State

19   Hospital which is a secured state psychiatric hospital in

20   California as a staff psychologist on one of their units.

21   Then I relocated back to Ohio and since then -- that was in

22   the winter of 2003.  So since then I've worked at David H.

23   Roush and Associates which is a private practice, a

24   psychology practice in Fairborn.  I have worked at the

25   Forensic Psychiatry Center For Western Ohio which is a

1    regional forensic center that provides court-ordered

2    psychological evaluations for Montgomery County and about

3    nine or ten of the surrounding counties.  And I worked for

4    Wright State University.  I taught one forensic assessment

5    class for their doctoral psychology program for about six

6    years.  I stopped doing that a few years ago.  For the past

7    two years I've been a psychologist for Montgomery County

8    Board of Developmental Disabilities Services.

9    Q.    As part of being a staff psychologist at the prison in

10   California, what kind of things were you asked to do?

11   A.    It wasn't a prison.  It was comparable to Summit

12   Behavioral Healthcare.

13   Q.    Okay.

14   A.    So it's a psychiatric hospital.  So I had a couple

15   different responsibilities.  Part of my responsibilities was

16   conducting group therapy for the sexually violent predators

17   who were there under civil commitment.  My main

18   responsibility was the unit psychologist on a unit that

19   housed the state prison inmates who needed to be stabilized

20   psychiatrically because they were too psychiatrically ill to

21   be in the prison system so they would come to the hospital,

22   they would get stabilized.  Then they would return to the

23   state prison system.

24   Q.    Approximately, I know it would be an estimate, how many

25   folks would you see in that capacity in California?

1    A.    Well, on the unit that I worked on, we had somewhere

2    around 40 or 45 inmates at any given time.  The turnover

3    rate was probably once every, they would be there probably

4    on average about four or five months.  So I could only

5    estimate probably you know, a couple hundred different

6    individuals in that time.

7    Q.    Additionally, you described that you worked with Dr.

8    Roush in Fairborn?

9    A.    I work in his practice, correct.

10   Q.    What kind of activities do you do in that practice?

11   A.    I do evaluations for courts that may be referred

12   directly by the courts or maybe from the defense or

13   prosecution.  I provide juvenile sex offender treatment and

14   assessment.  Then I also see a small caseload of individuals

15   who are just coming in, referred by their family physician

16   or their insurance company for a range of problems.

17   Q.    They're voluntarily coming to see you basically?

18   A.    Right.

19   Q.    Then you indicated you also work with forensic

20   psychiatry in Western Ohio?

21   A.    That's correct.

22   Q.    You do court-ordered evaluations for state courts?

23   A.    For common pleas and municipal courts.

24   Q.    About how many folks have you evaluated for purposes of

25   competency in the course of all your practice?

1   A.   I've probably conducted a total of, an estimate

2   somewhere in the 14 to 1500 range, since I've been doing

3   that.  I would guess probably somewhere around a third, 30

4   to 40 percent would include competency-to-stand-trial

5   evaluations.  Somewhere around 500 or so.

6   Q.   You've appeared in court and testified in this capacity

7   before?

8   A.   Yes.

9   Q.   Are you board certified in any kind of specialties or

10  do you have any kind of special certifications as part of

11  your practice?

12  A.   No, sir.

13  Q.   In this case you were asked to do an evaluation of a

14  Mr. Skelton, is that correct?

15  A.   Yes.

16       MR. HUNT:  Your Honor, if the witness could be

17  shown Exhibit 1 by the government.

18  BY MR. HUNT:

19  Q.   Sir, do you recognize what Exhibit 1 is?

20  A.   (Witness examining document.)  Yes.  It's a copy of my

21  report.

22  Q.   I believe your report was approximately ten pages long?

23  A.   Yes.

24  Q.   Is this the report that you generated in conjunction

25  with your evaluation of Mr. Skelton for purposes of

1    determining whether he was competent?

2    A.    Yes, it is.

3    Q.    For purposes of your testimony here today, would you

4    adopt the findings and information in that report as part of

5    your testimony?

6    A.    Yes.

7    Q.    You have set forth several tests and steps you took as

8    far as evaluating Mr. Skelton in that report, is that

9    correct?

10   A.    Yes.

11   Q.    Based on the evaluation and testing that you did, did

12   you ultimately come to a conclusion to a reasonable degree

13   of psychological certainty as to whether Mr. Skelton, A,

14   understood the nature of the proceedings against him and, B,

15   his ability to assist in his defense?

16   A.    Yes.

17   Q.    What was your conclusion, sir?

18   A.    It's my opinion that he was able to understand the

19   nature and consequences of the proceedings against him and

20   that he would be able to assist in his defense.

21         MR. HUNT:  Your Honor, at this time I would tender

22   the witness to the defense.

23         THE COURT:  Mr. Hunt, that's fine.  I would ask

24   if, Ms. Bennett, you wish to question the doctor on his

25   other report, mental status at the time of the offense.

1      MS. BENNETT:  Judge, I don't necessarily need to

2  question about that at this time.

3      THE COURT:  All right.  Then there's no reason to

4  introduce that report into evidence.  Is the defense

5  inclined to stipulate the doctor's qualifications?

6      MS. BENNETT:  Not at this time, Judge, I have a

7  few questions for the doctor.

8      THE COURT:  I understand.  Thank you, Mr. Hunt.

9      MR. HUNT:  Thank you.

10      THE COURT:  On cross, Ms. Bennett.

11      MS. BENNETT:  Thank you, your Honor.

12                      CROSS-EXAMINATION

13  BY MS. BENNETT:

14  Q.   Good morning, Dr. Kidd.

15  A.   Good morning.

16  Q.   In terms of your training and your education, can you

17  tell me what percentage of the people that you evaluate and

18  treat -- I believe you said that you see about 14 to 1500

19  patients a year for forensic psychology of Ohio, correct?

20  A.   No.

21  Q.   No?

22  A.   No, ma'am.  It was 14 to 1500 total evaluations that

23  I've done since about 2003.

24  Q.   So since 2003.  Approximately how many patients do you

25  see a year?

1    A.    Well, up until about two years ago, I was conducting

2    somewhere around a hundred -- between a hundred and 150

3    evaluations for the Forensic Psychiatry Center.  There was a

4    year or two where I did close to 200.  In the past couple

5    years, I only do evaluations a couple times a month.  So in

6    the past two years, it's been probably been like 20 to 25 a

7    year.

8    Q.    Since 2013 you've done about 20 to 25 evaluations per

9    year?

10    A.    Approximately, yes -- well, for the forensic psychiatry

11    center.  Probably another five to ten through Dr. Roush's

12    office.  So 25 to 35 per year over the past two years.

13    Q.    Those are evaluations that you're conducting based on,

14    I'm assuming, competency and sanity issues?

15    A.    Those are the main -- there have been other evaluations

16    that I've done.  Those are the two most commonly referred

17    issues.

18    Q.    Then in terms of treating patients, you testified that,

19    I'm not sure if it's in your current practice or in the past

20    practice, that you also see patients who voluntarily come in

21    just because they need a psychologist, correct?

22    A.    That's correct.

23    Q.    What percentage of your practice would you ascribe to

24    those kinds of people?

25    A.    I have to do the math, if that's okay.

1    Q.    Sure.

2    A.    Currently, I would estimate probably around 20.

3    Probably about 20 percent.

4    Q.    About 20 percent.  So that would -- I'm assuming if

5    you're doing 20 to 25 evaluations for forensic psychology,

6    about 20 through Dr. Roush's practice or so, do you have a

7    number as to how many patients you might see just on a

8    voluntary basis?

9    A.    At any given time?

10    Q.    Let's just state for the last two years.

11    A.    No.  That's harder to estimate.  I could make a very

12    general estimate, but sometimes when I see those

13    individuals, they may come in for one or two sessions and

14    then they don't come back.  I have other clients who may

15    come for six months at a time.  There's a pretty wide

16    variance in the length of time which I think makes it a

17    little more challenging to estimate how many I've seen

18    total.

19    Q.    Let's say on a regular basis.  Let's take the ones out

20    of the equation who come once and never come back.

21    A.    There's such a wide range, though, because then you

22    have people who may come four or five times for three to

23    four months and stop.  I have some people I've seen for a

24    year voluntarily.  Really across that spectrum anywhere

25    probably from one or two sessions to six to 12 months.  In

1  the past two years, maybe 50.

2  Q.   In the past two years, you've also been working for the

3  Montgomery County Board of Developmental Services?

4  A.   Developmental Disability Services, correct.

5  Q.   Do you do evaluations for them also or are you doing

6  more treatment-related type activity?

7  A.   I don't do any treatment for them.  I conduct the

8  psychological evaluations that they use to determine whether

9  an individual is eligible for their services or eligible for

10 certain funding.  So those are usually assessments of

11 whether they have a developmental disability.  And I also

12 supervise the -- we have a small group of behavioral

13 management specialists who work with individuals who exhibit

14 behavior problems.  I supervise them.  I also conduct

15 occasional risk assessments on individuals for either a

16 sexual or violence risk.  Then I also provide some

17 consultation with our staff just on issues that they're

18 dealing with, with clients or certain cases.

19 Q.   So would you then say that the majority of your

20 practice would be dedicated towards doing evaluations for

21 competency or for, I guess, the Montgomery County Board of

22 Developmental Services as opposed to treating people or

23 counseling people who are in need of mental health services?

24 A.   Currently?

25 Q.   Uh-huh (affirmative response).

1    A.    No, I wouldn't say that the evaluations are a majority.

2    I would say it's probably fairly evenly split as far as the

3    actual clinical work that I do because some of the work I do

4    for the Board of Developmental Disabilities, it's more

5    supervisory work.  It's not psychological evaluations or

6    psychological treatment.  But overall in the three jobs that

7    I have currently, I would say that the treatment versus

8    assessment work that I do is probably fairly evenly split.

9    Q.    So approximately 50/50.  Is there a certain -- I don't

10   want to say genre, but is there a certain field of

11   psychology you specialize in?  Say for instance do you

12   specialize in sexual -- sex disorders, childhood issues, is

13   there a certain area you specialize in?

14   A.    For assessments or for treatment or just in general?

15   Q.    Just in general.

16   A.    I would say what I've -- a fair amount of the practice

17   that I've done I would say -- I'm a general clinical

18   psychologist, but a fair amount of the practice that I've

19   done has been conducting evaluations for courts and treating

20   individuals who were referred by -- who have legal problems

21   for treatment.  So individuals who are referred by the

22   courts or the probation officers, children services,

23   agencies like that.

24   Q.    Those are for any legal issues, when you say legal --

25   A.    Most of them have been sex offenders.

1    Q.    Then the majority of what you do would you say pertains

2    to sex offenses --

3    A.    No.

4    Q.    -- in terms of the work you do with the courts?

5    A.    No.  A majority of the treatment that I do for

6    individuals who are court involved would be the sex

7    offenders.  Evaluations, probably a majority or the greater

8    proportion of the different types of evaluations that I do

9    are probably competency to stand trial, individuals who may

10   be pleading not guilty by reason of insanity, and also sex

11   offender risk assessments.  Those are probably the three

12   areas of assessment that I've done the most in.

13   Q.    Do you treat juveniles or children?

14   A.    Adolescents.  I don't treat young children.

15   Q.    Adolescents meaning from 13 to?

16   A.    12 or 13 and up to include adults, adults also.

17   Q.    Your treatment of them would include, I guess,

18   evaluating and diagnosing whatever mental health condition

19   they might suffer from and then treating them for that

20   condition?

21   A.    Sometimes.  Sometimes they've come to me already having

22   a diagnosis and that's pretty clearly recorded.  So I just

23   see them for treatment, if they've been diagnosed and

24   referred to me for therapy.

25   Q.    You indicated that you've taught at Wright State.  I

1    believe that was in -- actually, when were you teaching at

2    Wright State?

3    A.    I stopped teaching that class, I believe in 2012.  I

4    taught classes there for six or seven years.  So probably

5    somewhere around, probably I started about 2006, so about

6    six years.

7    Q.    That was forensic psychology?

8    A.    So they had a couple different forensic psychology

9    courses.  One year I taught an introduction to forensic

10   psychology course.  Then the rest of the years, I taught a

11   forensic assessment course.  Then they also asked me to

12   teach one year in advance a forensic assessment course which

13   was part two to the main assessment course that I taught.

14   Q.    Have you ever written any articles or published any

15   articles pertaining to your area of work?

16   A.    I've published one article.  That was based on my

17   doctoral dissertation.  That was in an on-line journal that

18   had to do with rural psychology.  My dissertation topic was

19   on school shooters.  And at the time there was a relatively

20   higher incident rate of those offenses occurring in rural

21   communities.

22   Q.    But since that publication, you've not done any

23   publications?

24   A.    No, there was a, around that same time -- this was when

25   I was in graduate school and shortly after -- I think we had

1    a -- there was like a guide for psychologists on literature

2    databases.  We did a review of that.  We published -- it was

3    like a brochure.  It wasn't like a foldout brochure.  It was

4    more significant than that.  We did publish a brochure.

5    That was like a journal article.  It was not an academic

6    research article.  But since then I haven't done any

7    publications.  I've done some presentations at conferences

8    and to organizations, but not publishing articles, no.

9    Q.    You indicated that you testified before in courts.  I'm

10   assuming Montgomery County courts or the like.  Have you

11   ever testified before in federal court?

12   A.    No, ma'am.

13   Q.    Approximately how many times have you testified in the

14   various courts?

15   A.    I would estimate probably somewhere around 40 times, 40

16   to 50 times.  It seemed like I was testifying about four or

17   five times a year for the 10 years that I was, before I

18   started working for the Board of Developmental Disabilities.

19   Q.    Were those common pleas courts, municipal courts, civil

20   courts, what kind of courts were those?

21   A.    Municipal courts, common pleas courts, and juvenile

22   courts.

23   Q.    I'm assuming your testimony would have been in

24   relationship to whatever competency or sanity, or finding

25   whether or not someone would have been eligible for services

1    with Montgomery County Developmental Disability Board?

2    A.    I've never testified for eligibility for services or in

3    any capacity for the Board of Developmental Disabilities

4    Services.

5    Q.    Okay.

6    A.    When I've testified, there were a few times, like maybe

7    twice that I had to testify in cases that involved therapy

8    clients of mine.  But the rest of the times were all when

9    I've done evaluations for courts.

10   Q.    Besides evaluations for courts, approximately how many

11   times have you done evaluations for, let's say defense

12   counsel?

13   A.    A large majority of the evaluations that I've done have

14   been through the forensic psychiatry center.  They just get

15   referrals directly from the courts.  So a large majority of

16   the time it's not been for one side or the other.  When I've

17   gotten referrals from prosecution offices or defense

18   attorneys, that's been through Dr. Roush's office, through

19   the private practice, and I have to apologize because I

20   don't know what the percentage is.  I know I've gotten

21   referrals from both sides.  Probably a greater percentage

22   from the defense but I don't have numbers and it would be

23   difficult for me to estimate a percentage, but I know I've

24   gotten a number of referrals from both parties.

25   Q.    So in terms of your work relationship through Dr.

1   Roush's office, are you independent or do you work for Dr.

2   Roush?

3   A.   I have a contract with him.  So I'm not an employee of

4   his.  I just have a contract with him to work in his

5   practice so I have an office there.  We share the building,

6   the actual office space.  We share resources.  So that's the

7   type of arrangement.

8   Q.   Your clients are your clients and his clients are his?

9   A.   That's correct.

10          MS. BENNETT:  Judge, I'm going to kind of move

11  into the competency.

12          THE COURT:  Go ahead.

13  BY MS. BENNETT:

14  Q.   In terms of Mr. Skelton's case, Mr. Hunt just asked you

15  about Government's Exhibit, I believe it's one which would

16  be the competency report you prepared in relationship to

17  this matter, correct?

18  A.   Yes.

19  Q.   In preparing the competency report, typically what's

20  your protocol when you do competency evaluations, how do you

21  start, what do you do investigate, how do you go about fact

22  finding and the like?

23  A.   Sure.  So usually I'll get discovery materials before

24  the evaluation and I'll review those so I have some idea

25  about the nature of the case, the content of the police

1    reports, if there's specific information on there.  I may

2    want to ask the Defendant about the contents of those

3    reports.  Indictments, so I understand what the charges are.

4    If there's any kind of mental health records that are

5    provided, I would review those.  More often than not, those

6    are, if I get mental health records, I get those after

7    seeing the individual because I would have to have them sign

8    a release.  But any records that are provided to me in

9    advance, I would review those before interviewing the

10   Defendant.  Then I interview the Defendant.  That usually

11   takes somewhere around two hours or so.  It really just

12   depends.  But I would say on average about two hours.

13       When I meet with the Defendant initially, I review with

14   them the reason that they're there, the fact that there's no

15   privacy between us, that this is not like a therapeutic

16   relationship and that I'll be producing a report and sending

17   that to the Court.  Or if their attorney referred them, I

18   may send it directly to their attorney or I may give it to

19   them and they're responsible to get it to the attorney.  It

20   depends how the referral happens.

21       After we do the introductions, then I conduct the

22   clinical interview which involves me asking questions about

23   family history, education, work history, drug and alcohol

24   use, mental health, medical, legal history, just a general

25   background interview.  Actually let me back up.

1        If I'm doing a competency to stand trial evaluation,

2    usually I will ask the specific competency-related questions

3    first.  That was the case with Mr. Skelton's evaluation too.

4    So I asked those questions.  And then I conduct the

5    background interview.  And then if -- by then I usually have

6    enough information to determine whether I need to conduct

7    any psychological testing.  That may happen on the same day

8    or it may require scheduling a separate day for the

9    individual to come in, to conduct the testing.  In Mr.

10    Skelton's case, he came back on a second day to complete a

11    questionnaire for me.  His father also completed a

12    questionnaire for me on that day.

13    Q.   In Mr. Skelton's case, you would have then gotten

14    records from the Court, from defense, prosecutor, reviewed

15    those, then have Mr. Skelton in to speak with him for about

16    two hours.  Then during that two-hour conversation, you

17    would determine whether or not you would need to do any

18    psychological testing.  You would have him come back on a

19    separate date to complete that, correct?

20    A.   In Mr. Skelton's case, that's the way it happened.

21    Depending on the situation and the time that we have, I may

22    have them do the testing on the same day as the interview.

23    But that ends up being -- depending on the test, that ends

24    up being a really long day.  If we have the luxury to

25    schedule it on a second day, then that's the preference.  We

1    were able to do that with Mr. Skelton.

2    Q.    In Mr. Skelton's case, when you had him come back on

3    the second day, exactly what did you have him do?

4    A.    He completed the Minnesota Multiphasic Personality

5    Inventory-II, which is like a personality test.  That test

6    is like a questionnaire and he took that in a separate

7    office.  And so I sat him in a separate office, paper and

8    pencil fill-in-the-bubble test.  He completed that for me.

9        In the meantime, I talked with his father and got some

10    information and had his father fill out a questionnaire for

11    me.  It was a fairly brief questionnaire, but he did that in

12    the waiting room while Mr. Skelton was taking the

13    questionnaire I had him do.

14    Q.    Is it typical for you to have parents of the people

15    you're evaluating complete questionnaires, is that part of

16    the normal evaluation process?

17    A.    It depends on the situation.

18    Q.    But in this case it was part of your normal process

19    based on whatever situation you determined existed?

20    A.    Yes.

21    Q.    Approximately how long was Mr. Skelton in your office

22    that second day?

23    A.    I think it was somewhere around an hour and a half,

24    maybe two hours.

25    Q.    So the total time you would have spent directly with

1    Mr. Skelton in terms of interviewing, testing would have

2    been approximately four hours?

3    A.    Including the testing.  I wasn't in the room when he

4    completed the test, but the total time that he was involved

5    in the assessment was probably somewhere in the four-hour

6    range.

7    Q.    Now, when you receive medical or mental health records

8    as part of your evaluation process from other agencies, I'm

9    assuming you review those records but do you follow up with

10   any of the providers who would have created those records or

11   who would have documented information about Mr. Skelton

12   within those records?

13   A.    It would depend.  If there was information that I

14   needed that wasn't in the records, I may do that.  I usually

15   don't do that.  It would also depend on whether the

16   individual signed a release for me to get the records and

17   allow me to speak with the clinician as opposed to their

18   attorney or somebody else providing me with the records

19   where I might not have a release to talk to anybody or get

20   additional information.

21        So, I usually don't talk to the clinician directly.  I

22   would usually, if there's additional information that I feel

23   like I need, I would ask for records because -- for two

24   reasons.  One, they should be documenting anything that's

25   relevant to the individual's treatment or care.  And then

1    also I prefer to have written documentation of that in case

2    I have to produce it in court or have to show evidence of

3    what information I'm using for my evaluation.

4    Q.   So it's fair to say that in Mr. Skelton's case you did

5    not speak with anyone outside of, I guess Mr. Skelton to

6    follow up with any of the records that you had received?

7    A.   That's correct.

8    Q.   Then you prepared your report based on -- and you've

9    listed here in your report the information that you

10   considered in preparing the report, correct?

11   A.   Correct.

12   Q.   I would like to talk to you about certain specific

13   conclusions that you've reached and certain statements that

14   you've made in that report to get some clarification on

15   those issues.  So if you don't mind, if you could -- do you

16   have the report in front of you?

17   A.   I have Exhibit 1?

18   Q.   Yes.  I'm going to refer you to certain pages.  Then

19   I'm also going to refer you to --

20           MS. BENNETT:  Your Honor, if he could be provided

21   with Defendant's Exhibits A and B, because I'm going to be

22   kind of flipping back and forth.

23   BY MS. BENNETT:

24   Q.   First, let me ask you, do you recognize what's been

25   marked for identification as Defendant's Exhibit A?

1    A.    Well, the front says Rocking Horse Center.  So without

2    going through all of the records, I'm only assuming that

3    these are treatment records from the Rocking Horse Center.

4    Q.    You can unband it and review it and review it if you

5    need to, to be sure.

6            THE COURT:  Can we just make the assumption that

7    they are as represented to be and then go directly into the

8    question.

9            MS. BENNETT:  Okay.  Thank you, your Honor.

10            THE COURT:  Thank you.

11            THE WITNESS:  These appear to be Rocking Horse

12    Center records.  I recognize them because I looked in the

13    papers and that's the heading that's on the documentation on

14    Exhibit A.

15    BY MS. BENNETT:

16    Q.    Then Exhibit B, do you recognize that document?

17    A.    Do I recognize it?  I mean I'm reading it so I mean I

18    can identify what it is from reading it.

19    Q.    Do you recognize that document as something that you

20    were in possession of and something that you considered when

21    you prepared the competency evaluation report?

22    A.    It looks familiar.  I received quite a bit of records

23    on disks.  So they're on disks; my records.  So I can't say

24    for a hundred percent certain that this is exactly what I

25    was given or that this is exactly what I was given, but this

1  does look like a document that I read and that I referenced

2  some of the contents of in my report.

3  Q.  If I can just have you now turn to your report to page

4  2.  To your mental status summary.  I'm assuming this is you

5  summarizing your impressions of Mr. Skelton as you're

6  sitting there talking to him, correct?

7  A.  That's correct.

8  Q.  In the second paragraph, the beginning of the second

9  paragraph, you indicated, Mr. Skelton did not exhibit any

10  unusual behavior.  No involuntary movements.  No

11  hyperkinesia or psychomotor slowing was observed.  Gait and

12  posture were normal, correct?

13  A.  Correct.

14  Q.  That was based on your current perception of Mr.

15  Skelton?

16  A.  At the time that I evaluated him, yes.

17  Q.  Did you talk to him about his psychological or mental

18  health status prior to you speaking with him that day?

19  A.  I don't understand your question.  Could you repeat it

20  or rephrase it, please.

21  Q.  Okay.  You indicated that you didn't observe any

22  unusual behavior da da da da da da.  Did you talk to Mr.

23  Skelton about any behaviors he may have exhibited prior to

24  meeting with you that day?  Did you ever ask him whether or

25  not he's ever exhibited X behavior, Y behavior or Z behavior

1    prior to your meeting with him?

2    A.    At any point in his life?

3    Q.    Sure.

4    A.    Sure.  My entire clinical interview was about some of

5    his life history, some of which included his behavior, like

6    his mental health history and symptoms he experienced and

7    his behavior in school, his drug and alcohol use habits,

8    legal history.  So that would include past behavior.

9    Q.    Okay.

10   A.    We talked about what his explanation of the alleged

11   offense was which would be considered past behavior.

12   Q.    Okay.  Then in the next paragraph you said he did not

13   become tangential or circumstantial.  His thoughts seemed

14   organized and logical.  While he did discuss feeling

15   concerned for his safety from others in the recent past,

16   they did not seem to be of the nature or severity to be

17   considered paranoid delusion, correct, that was your

18   assessment based on his current state?

19   A.    That's correct.

20   Q.    Let's go to page 4.  I'm looking specifically under the

21   heading Mental Health History, where you've indicated that

22   Mr. Skelton advised you he had been diagnosed with Attention

23   Deficit/Hyperactivity Disorder, Bipolar and Asperger

24   disorder in the past, do you see that paragraph?

25   A.    Yes, I do.

1  Q.    You then go on to say:  However, when queried about

2  symptoms, he did not endorse any symptoms of a manic

3  episode, which you believe is necessary for a diagnosis of

4  bipolar, other than elevated mood when he was younger,

5  correct?

6  A.    Correct.

7  Q.    Was that based on just your discussion with Mr. Skelton

8  or did you at least -- did you look at the records from

9  Rocking Horse at the time you made that conclusion -- or you

10  made that determination?

11  A.    The determination I made in that sentence was that he,

12  when I asked him about some specific symptoms of manic

13  episodes, he told me he had not experienced those in the

14  past.  So this statement that I made in this particular

15  paragraph is that when I asked him about the symptoms, he

16  told me he did not experience those in the past.

17  Q.    But my question is, in talking to him at this point in

18  time, had you reviewed the records from Rocking Horse at the

19  time you were talking to him?  I'm assuming you had because

20  you said normally you would have gotten the records and then

21  you meet with the person.

22  A.    Correct.

23  Q.    So at the time you were talking with him, you would

24  have reviewed the records from Rocking Horse, correct?

25  A.    Correct.

1    Q.   Did you find that that statement from Mr. Skelton, did

2    you find that to be consistent with what you had reviewed

3    from the Rocking Horse Center?

4    A.   There were some symptoms in the Rocking Horse Center

5    records that could possibly be attributed to someone with

6    bipolar disorder or someone with depression or difficulty

7    adjusting to significant change in their life or Attention

8    Deficit/Hyperactivity Disorder.  And so -- I found his

9    statement that he didn't experience manic, symptoms of a

10   manic episode to be in conflict with the diagnosis that he

11   was given at Rocking Horse but, for example, when I asked

12   him if he'd ever experienced a reduced need for sleep, or

13   maybe he could feel completely well-rested after only two or

14   three hours of sleep a night for several weeks in a row.

15   That is a symptom of manic episode.  I don't recall that

16   particular symptom being in the Rocking Horse records, or

17   periods of grandiosity.  That's a symptom that I don't

18   remember being in the Rocking Horse Center records that he

19   did not, he told me he had not experienced.

20        Records did reflect elevated mood and a lot of problems

21   with anger which anger is not a symptom of bipolar disorder

22   but some people experience anger when they have bipolar

23   disorder or when they have severe depression especially in

24   kids where it may present somewhat differently.  This is a

25   really long answer to your question but I'm trying to answer

1    it the best I can.  I think there were some symptoms in the

2    records that he did not -- that may have been attributed to

3    something else other than bipolar disorder.  So I don't know

4    if that answers your question or not.

5    Q.    It does.  I apologize for these not being Bates stamped

6    but I'm going to see if you can turn for me in the Rocking

7    Horse records to the record dated 9-27-11.  These are in

8    reverse chronological order.  There's a record there that

9    says Rocking Horse Center Behavioral Medical Process, date

10   9-27-11.

11   A.    This entire stack is reverse chronological order?

12   Q.    Yes.

13   A.    I'm looking for 9-27-11?

14   Q.    Yes.  These aren't in reverse chronological order.  I'm

15   looking at one record toward the front that's 5-22-08.  I'm

16   looking at one further back that's 10-19-09.  I'm looking at

17   another one that's 9-29-08?

18          THE COURT:  Would you be inclined to approach the

19   witness and show him the document that you hope to examine

20   him from?

21          MS. BENNETT:  Certainly, your Honor, thank you.

22          THE COURT:  Either your copy or find the place in

23   his.

24      Ms. Bennett, I'm wondering if it might be helpful if we

25   took a brief recess, gave you the opportunity to find and

1    maybe tab all the documents that you're going to be

2    examining from.

3            MS. BENNETT:  That would be fantastic, Judge.  I

4    apologize.  That would be great.

5            THE COURT:  None necessary.  All right.  We will

6    be in recess.  Simply let Cindy know when you're ready to

7    proceed.  We are in recess.

8            (Recess taken at 11:03 a.m.)

9                         IN OPEN COURT

10                         11:22 a.m.

11           THE COURT:  Ms. Bennett.

12           MS. BENNETT:  Thank you, your Honor.  Judge, based

13   on the wisdom and genius of Mr. Hunt, we figured we could

14   probably use the overhead to kind of reference these

15   records.  It might be a lot simpler.  I did mark the

16   doctor's exhibits but I thought for the benefit of the Court

17   it might be better to use the overhead.

18           THE COURT:  That's fine.  Debi, type up a copy of

19   Ms. Bennett's remarks for whatever use Mr. Hunt may make of

20   them.  Proceed, if you would.

21           MS. BENNETT:  Thank you, your Honor.

22   BY MS. BENNETT:

23   Q.   Doctor, I've marked in your Exhibit certain pages that

24   I've identified with numbers 1, 2 -- tabs indicating numbers

25   1, 2, 3, 4 and the like.  I've also put on the screen -- I'm

1  not sure if you can see in front of you there -- the

2  Exhibits I'm going to be referring to.

3      The first Exhibit is the one I was trying to have you

4  locate earlier, which is an exhibit dated 9-27-11, from the

5  Rocking Horse Center.  You indicated that in your opinion

6  symptoms or behavior that would be consistent with bipolar

7  would include symptoms such as not sleeping, grandiose

8  behaviors, correct?

9  A.  Specifically with the sleeping is a reduced need for

10  sleep, not insomnia necessarily, but where an individual

11  only needs a few hours a night of sleep to feel sufficiently

12  rested for a certain period of time.

13  Q.  You reviewed these Rocking Horse records, correct?

14  A.  Yes, ma'am.

15  Q.  You would agree with me that there are several records

16  that indicate therein that Mr. Skelton either was not

17  sleeping or was sleeping for brief periods at night?

18  A.  Correct.  I'm looking at one that refers to restless

19  nights.

20  Q.  If I can have you look at the second record.  This is

21  dated 3-1 of '08 from the Rocking Horse.  Can you indicate

22  what it says on that record under Current Problems.

23  A.  The record I'm looking at appears to be the same but

24  just for clarification, I'm sorry, I can't tell the date

25  because it's cut off on the side.  Can you repeat your

1    question?

2    Q.   If you can read what it says under Current Problems.

3    A.   Does it matter whether I read from the paper or the

4    screen?

5    Q.   I don't think it matters if it's the same record.

6    A.   Okay.  Very low tolerance of stress/frustration.  Sleep

7    continues to be restless and feels tired in a.m.  Gets up

8    multiple times in the night to void.  So restless can be --

9    I'm not sure what that word is.

10   Q.   Heard in the next room.

11   A.   Okay, heard in the next room.

12   Q.   Then, if we can go to the next record I'm going to put

13   on here which is dated 1-8-08 which would be labelled number

14   3 in your packet.  Have you located that record?

15   A.   Yes, ma'am.

16   Q.   It does indicate there that he's still awakening in the

17   night, correct?

18   A.   That's correct.

19   Q.   At the bottom of that record where it talks about, in

20   the section that says Laboratory, can you read what it says

21   there.

22   A.   Head five degree GTT.  11/7/07 had sleep study on

23   11/20/07.

24   Q.   The fact he would have been referred for a sleep study,

25   would that be significant to you?

1    A.    What that would imply to me is that there might have

2    been some question that they wanted to rule out sleep apnea

3    or some type of physical condition that might be affecting

4    the quality of his sleep.

5    Q.    On the next page of that very same date, 1-18 of '08

6    under the Differential Diagnosis and the Justification For

7    All of the Above Diagnoses, it does indicate there, correct,

8    that he has a sleep disorder under Axis III?

9    A.    The next record number 4 in your packet is different.

10   Q.    No, no, not the next record.  The next page of the

11   document that you were just looking at.  The second page of

12   the record.

13   A.    Could you repeat your question?  I'm sorry.

14   Q.    Sure.  It does indicate under the Axis, the

15   justification for the diagnosis of bipolar disorder and

16   AD/HD and dyssomnia NOS.  It does indicate there, does it

17   not, that he has a sleep disorder?

18   A.    Yes.

19   Q.    It also indicates there, I guess, that they were

20   concerned at that point in time about Asperger's disorder,

21   correct?

22   A.    Correct.

23   Q.    I'm going to jump you forward to the record that's

24   identified as number 5.  That's a record dated 10-26-of

25   2011.  Have you found that record?

1    A.    Yes, ma'am.

2    Q.    Can you review, indicate what it indicates as the

3    diagnoses on that record, and that's on page 2 of that

4    document, and the justification for those diagnoses?

5    A.    Yes.  Diagnoses are listed as adjustment disorder with

6    anxiety and depressed mood.  Bipolar, I don't know if that's

7    one or forward slash MRE which stands for Most Recent

8    Episode manic.  I'm not sure what that last the symbol is,

9    psychology or psychiatry symbol.  I'm not sure what the

10   abbreviation is, though.  Then the next diagnosis is

11   Asperger's.  Justification for all above diagnoses.

12   Grandiosity, decreased need for sleep, talkative,

13   psychomotor agitation, zero dangerousness is what I think

14   that says.

15   Q.    So you would agree with me that that record indicates,

16   contrary to what you've just stated, that Mr. Skelton had

17   suffered from a decreased need for sleep and grandiosity?

18   A.    Is that a question?

19   Q.    Yes.

20   A.    No.  I didn't say that he didn't experience those

21   problems.  I said that he denied experiencing those

22   problems.  So I would agree that this record contradicts

23   what Mr. Skelton told me, but I never made a statement that

24   I had an opinion about whether he experienced those symptoms

25   in 2011 or not.

1    Q.    I think my original question was related to the fact of

2    whether you found what he told you to be contradictory to

3    what the Rocking Horse records had indicated was my original

4    question that led me to you reviewing those records.

5    A.    I would agree with that.  What I understood you to say

6    or I thought you said just a moment ago was, does that

7    contradict what I said about him having grandiosity or

8    reduced need to sleep.  I never said that he did or didn't

9    have grandiosity or reduced need to sleep.  I said that he

10   reported to me that he didn't.  So the records are in

11   conflict with what he told me, but I didn't have an opinion

12   about whether he did or didn't have those symptoms in 2011.

13   Q.    Did it concern you that he would have told you that he

14   had not experienced those symptoms when in fact the record

15   indicates that he had?

16   A.    Concern me in what way?

17   Q.    In terms of relying on him for a history or being

18   concerned about whether or not the information he was

19   providing you was accurate.

20   A.    Well, about symptoms at that time or those -- the

21   symptoms of bipolar disorder possibly but not his, not his

22   reliability as far as the information he gave me in general.

23   In general he seemed like a fairly consistent reliable

24   historian.  But there obviously were some things that he

25   reported that were different than were in the records.

1          MS. BENNETT:  Judge, if I can have one moment.

2          THE COURT:  Take your time.

3          MS. BENNETT:  Thank you, your Honor.

4  BY MS. BENNETT:

5  Q.   If I can again, I'm not trying to beat a dead horse or

6  anything, if you can turn back to page 4 of your report,

7  that mental health history where you indicated he reported

8  he'd been diagnosed with AD/HD da da da da da.  However,

9  when queried about symptoms, he did not endorse any symptoms

10  of a manic episode.  Then in parentheses you put:  Necessary

11  for a diagnosis of bipolar disorder other than elevated mood

12  when he was younger.

13       My question to you about that statement is, he didn't

14  report any symptoms that you felt were necessary for a

15  diagnosis of bipolar disorder but are you saying in that

16  paragraph that you believe that that diagnosis was

17  incorrect?

18  A.   No, I'm saying that when I asked him, when queried or

19  when I asked him about symptoms, he did not endorse or he

20  did not say that he had those symptoms.

21  Q.   At the time that you were asking him about that, you

22  had reviewed the Rocking Horse records?

23  A.   Yes.

24  Q.   Did you then ask him about the symptoms that were

25  reported in those records?  For instance, did you say to

1    him, I'm not sure why you say you've never experienced this

2    symptom.  It says on this page here on this date you

3    suffered from X or Y or Z?

4    A.    No, I didn't.

5    Q.    Is there some reason you would not have asked him about

6    that or confronted him about that?

7    A.    I'm not sure.  I don't remember exactly where my

8    thinking was at the time that I did the evaluation as far as

9    what I was thinking about next or what I felt was most

10   important at that point in the interview.  What I was doing

11   at that point in the evaluation was collecting background

12   information and getting his perspective.  I knew I had the

13   records and I would summarize those records.  And when I

14   collect the information, my primary goal for competency to

15   stand trial purposes is his current mental state.

16        So whether he provided conflicting information with

17   symptoms he may or may not have experienced several years

18   ago was not as important for the purpose of me determining

19   his current mental state and how it affected his ability to

20   participate in his defense.  It was not as important to me,

21   so that may have been a reason why I didn't follow up in

22   that level of detail.

23   Q.    Let's talk about some other parts of your report.

24   Let's go to page 6.  On page 6, I'm talking about the

25   section that indicates interview with Ron Skelton who I'm

1    assuming, then, is Mr. Skelton's father.

2    A.    Yes.

3    Q.    Correct?

4    A.    Correct.

5    Q.    In the last paragraph, you indicate that Mr. Skelton's

6    father confirmed much of the information Mr. Skelton had

7    given about the instant offense including talking to him

8    about shutting down Twitter accounts.  His father shared his

9    concerns about people coming after him for the offensive

10   remarks he had made on Twitter.  His father reported he did

11   not talk of auditory hallucinogens around the time of the

12   offense but he did make vague comments about feeling

13   something eerie in their house.  Eerie you put in quotes.

14   In addition, he asked his father if he could start taking

15   psychotropic medications again.  Did you find any of that to

16   be significant to your report?

17   A.    I did not find that to be significant enough to change

18   my opinion but I did take note of that.  That was

19   information that I collected from his father.  I didn't go

20   back and ask Mr. Skelton about it afterwards.  He was taking

21   a psychological test.  Then they left afterward.  So I did

22   not follow up with that with him.  So I did take note of

23   that which is why I put it in the report, but it wasn't

24   something that was significant enough to me that I felt

25   would change my opinion.

1    Q.    Were you aware of the psychotropic medications Mr.

2    Skelton had been taking, that the father was referring to at

3    this time?

4    A.    Well, he was referring to being placed on medication at

5    the time, so he wasn't referring to any specific medication.

6    My understanding was that his father said that Mr. Skelton

7    had asked to be placed back on medication.  He did not

8    indicate to me specific medication that mister, that Ronald

9    Skelton II asked for.  So my understanding was, he was not

10   on any medication at that time either.

11   Q.    I guess my question to you is, when the father said he

12   asked if he could again start taking psychotropic

13   medication, did you not feel it was important to find out

14   what that medication was he was taking prior to this

15   request?

16   A.    Well, he'd been on several different medications at

17   different times in the past, so again he wasn't on any

18   medication at the time or recently.  My understanding was

19   that it had been a few years since he had been on any

20   psychotropic medication.  So I don't know if his father was

21   referring to the most recent medication he was on two years

22   ago or if he was just asking for medication in general.  His

23   father didn't specify.  He wasn't on medication at the time.

24   Again and my understanding was he did not ask for specific

25   medication.

1    Q.   I understand that.

2    A.   I don't know if he was asking for, the last time he was

3    on medication was two years ago.  I didn't ask the father

4    what medication Mr. Skelton was on two years ago, two years

5    prior to that.

6    Q.   That's my question.

7    A.   I'm sorry.

8    Q.   Would that be important for you to know what medication

9    he had been taking two years prior that he was now asking to

10   be put on?

11   A.   One, I don't know if he was asking to be put back on

12   those specific medications.  The father did not say to me,

13   my son asked for the same medications he was on two years

14   ago.  So I don't know if he was referencing those specific

15   medications or not.  My understanding was he just asked to

16   be put on medication again.

17   Q.   You didn't inquire any further, correct?

18   A.   I did not ask him what medications he thought his son

19   was referring to or I did not ask what medications he was on

20   two years ago, no.

21   Q.   You also were aware in reviewing the Rocking Horse

22   records that the Rocking Horse had diagnosed Mr. Skelton

23   with having an autism spectrum disorder, correct?

24   A.   Correct.

25   Q.   When you evaluated Mr. Skelton, you disagreed with

1   their conclusions, correct?

2   A.   At the time that I evaluated Mr. Skelton, I did not

3   feel like he had an autism spectrum disorder.

4   Q.   Is that something that can be cured?

5   A.   No.  People can have improvement but as far as cured,

6   getting rid of it, I would say no.

7   Q.   Let me kind of go straight to the area in the section

8   of your report that I'm referring to.  How did you determine

9   that Mr. Skelton in your opinion did not have an autism

10  spectrum disorder?  I believe your words were on page 7 in

11  the very last paragraph of Gilliam Autism Rating Scale,

12  Third Edition.  It is the opinion of the psychologist that

13  the information obtained during the course of this

14  evaluation does not support a diagnosis of autism spectrum

15  disorder.  How did you reach that conclusion?

16  A.   Well, there were, I did not recall seeing specific

17  symptoms documented in the records of Asperger's.  And I

18  asked Mr. Skelton about problems that are associated with

19  Asperger's disorder and I asked him father about those

20  problems.  With that information, some of the additional

21  information that Mr. Skelton provided to me about his

22  history, specifically his social history, my observations,

23  behavioral observations during the interview and then the

24  results of the questionnaire, the Gilliam, I used all of

25  that information in making that statement.

1    Q.    Is that how you go about diagnosing an autism spectrum

2    disorder?  Is there a process by which you engage in, in

3    order to diagnose Autism Spectrum Disorder?

4    A.    There's no one single prescribed method for coming to

5    that conclusion or collecting that information.

6    Q.    You would agree with me, though, that the literature on

7    Autism Spectrum Disorder recommend that there be a two part,

8    a two-stage diagnostic process, correct?

9    A.    I'm not familiar with the two-stage diagnostic process.

10   Q.    You just don't know?

11   A.    I'm not sure what you're referring to.

12   Q.    The first stage in diagnosing an Autism Spectrum

13   Disorder would involve just a general screening process,

14   correct?

15   A.    It depends.  I'm not sure what resource you're

16   referring to that says that.  There's no single resource

17   that says that this is the only way to diagnose any

18   psychological condition but in general a clinician may go

19   through a screening process just like they may go through a

20   screening process for other disorders or they may just go

21   right to a more detailed comprehensive evaluation, but

22   clinicians may go through a screening process.

23   Q.    Have you ever diagnosed autism prior to today?

24   A.    Yes.

25   Q.    How many times have you diagnosed an autism disorder?

1    A.    I don't know.  I don't know how many times I've given

2    any diagnosis in the 12 years I've been a psychologist.

3    It's not information that I've recorded.

4    Q.    In your opinion, then, the testing and the information

5    that you had was sufficient for you to determine whether or

6    not that diagnosis that Rocking Horse had made was supported

7    by Mr. Skelton's I guess conduct or not?

8    A.    I'm not sure what you're asking as far as Rocking

9    Horse.

10   Q.    Let me rephrase that.

11   A.    Thank you.

12   Q.    You had Rocking Horse records and Rocking Horse had

13   been treating Mr. Skelton for sometime since he was an

14   infant, correct?

15   A.    Not since he was an infant.

16   Q.    Or a toddler or a child?

17   A.    My understanding it was around five or six.  It would

18   be a young child.

19   Q.    So they'd been treating him since he was a young child.

20   Throughout the course of their treatment, they diagnosed Mr.

21   Skelton with having an Autism Spectrum Disorder.  That's a

22   fair statement, correct?

23   A.    Yes, ma'am.

24   Q.    You met Mr. Skelton for four hours.  You spoke with

25   him.  You had him do testing.  You spoke with his father,

1    had his father do a screening test.  I believe it's a brief

2    screening test, you indicated?

3    A.    That's correct.

4    Q.    Based on that information, you indicated that the

5    Rocking Horse records do not support a diagnosis of an

6    Autism Spectrum Disorder?

7    A.    I'm saying that based on all of the information that I

8    obtained as part of my evaluation, that he at the time that

9    I evaluated him was not experiencing symptoms of Asperger's

10    disorder.

11    Q.    Are you aware of what medications Mr. Skelton was

12    taking at the time you evaluated him?

13    A.    He told me he was taking Haldol, Benztropine and

14    Ativan, PR as needed.

15    Q.    That was prescribed by the Rocking Horse, correct, that

16    was also verified by the Rocking Horse records?

17    A.    I don't recall who was prescribing that, what medical

18    doctor was prescribing that medication at the time.

19    Q.    Can you tell the Court, what is Haldol?

20    A.    Haldol is a typical antipsychotic medication that's

21    used for mood stabilization, my understanding.  Now I'll say

22    I'm not a medical doctor, but my understanding from just my

23    clinical experience is those can be used for mood

24    stabilization or psychotic symptoms or some physical

25    symptoms.  Also I think tremors possibly.

1    Q.    You're familiar with the fact that it's also used to

2    help minimize the symptoms of autism, correct?

3    A.    I am aware of some clients that take it for that

4    reason.

5    Q.    Can you tell me, what is Benztropine?

6    A.    Cogentin, for side effects, particularly Parkinsonian,

7    tremors or ticks.

8    Q.    It's also used to help lessen the side effects of

9    someone who might be taking Haldol?

10    A.    That's correct.

11    Q.    And Ativan, can you tell me what Ativan is?

12    A.    My understanding is that's usually prescribed for

13    anxiety.

14    Q.    At the time you saw Mr. Skelton, he had been taking

15    these drugs, correct?

16    A.    That's what he had told me, correct.

17    Q.    Let's look at the Rocking Horse records.  Let's look at

18    the record from 5-13-2015.  Can you indicate what records

19    the Rocking Horse has documented that he was using at the

20    time?

21    A.    You asked me what records the Rocking Horse.

22    Q.    I'm sorry, what medications.

23    A.    Benztropine Mesylate.  Haloperidol.  Lipitor, Ativan.

24          THE COURT:  I'm sorry, doctor?

25          THE WITNESS:  Lipitor, Ativan.  That's all I can

1    see.  I'm not sure what number.

2    Q.    That's fine.  I'm just trying to make sure that the

3    records did verify that he had been prescribed or he had

4    been taking those medications, it wasn't just from Mr.

5    Skelton that you received that information.  That

6    information also came from the Rocking Horse.

7    A.    Correct.

8              THE COURT:  Is that a statement or a question?

9              MS. BENNETT:  It's a question, your Honor, thank

10   you.

11             THE WITNESS:  Correct.

12   BY MS. BENNETT:

13   Q.    If I can turn your attention to the record marked as

14   number 6 which would be the date 2-3 of 2014, that would be

15   from the Rocking Horse.  I'm on page, I believe it's 3 of

16   that record.  This was a record that was generated after

17   clinicians at the Rocking Horse had met with Mr. Skelton and

18   evaluated him on that date, correct?

19   A.    You said my number 6, is that correct?

20   Q.    Yes, but on page 3.

21   A.    On my record number 6, pages 2 and 3 are a list of

22   medications.  I don't see what's on the screen.  So I'm

23   looking at the first page that you put 6.

24   Q.    Actually, I'm sorry, it's page 4, if you go to page 4.

25   A.    Okay.

1    Q.   Do you see that page?

2    A.   Yes, ma'am.

3    Q.   There, the Rocking Horse has documented Mr. Skelton's

4    mental status as of that day that they were seeing him,

5    correct?

6    A.   Yes.

7    Q.   I've highlighted certain lines there.  Can you just

8    kind of read the highlighted sections?

9    A.   Sleeping problems exist.  Psychomotor behaviors or

10   psychomotor agitation is observable.  Attention is gained

11   and distracted.

12   Q.   What does it mean when it says psychomotor behaviors or

13   psychomotor agitation is observable?  What does that mean,

14   psychomotor agitation?

15   A.   Hyperactivity.  Just increased movement.

16   Q.   Is it repetitive movement?

17   A.   No, not necessarily.  It would just be more the

18   individual would appear more physically active.  I'm not

19   sure exactly what they were referring to.  I would have to

20   say that in general it could just be a higher level of

21   physical activity.  It could be the individual's leg is

22   bouncing up and down or they're just kind of moving faster.

23   That's what I would interpret that to mean, something to

24   that effect.

25   Q.   Unintentional purposeless movement, movement that's

1    really not directed to any specific purpose, correct?

2    A.   I couldn't say whether, what the intentionality of it

3    would be, but not -- it wouldn't even necessarily be

4    purposeless.  I mean it's just as a general statement.  It

5    could be that they're moving faster while they're engaging

6    in some purposeful activity or it could be when they're

7    sitting in your office talking to you.

8    Q.   But would that be information that would cause you

9    concern if you are evaluating someone who has been diagnosed

10   with bipolar, Asperger's and the kind of conditions that Mr.

11   Skelton had been diagnosed with?

12   A.   It's information that I would take into account.  I

13   don't know if I would qualify it as being something that I

14   would be concerned about, but it would be information I

15   would take into account.

16   Q.   Did you take it into account?

17   A.   Yes.

18   Q.   So if you've gone through the Rocking Horse records --

19   I'm not going to go through all of these records, but you

20   would agree with me that there are several records which

21   would document either psychotic behavior, behavior that

22   would be consistent with restlessness, involuntary movement

23   and the like that could be consistent with bipolar and

24   Asperger's as the Rocking Horse had diagnosed him?

25   A.   You had said some different things there that I

1  wouldn't necessarily agree with in the statement as a whole.

2            THE COURT:  Finish, doctor.

3            THE WITNESS:  So referring specifically to the

4  psychomotor agitation, I considered the information in the

5  Rocking Horse records.  A symptom like that or an

6  observation like that could be from, it would not be from

7  what they described -- psychomotor agitation would not be

8  from Asperger's disorder.  That's not a symptom I would

9  attribute to Asperger disorder.  It may be attributable to a

10  manic episode.  Although they said no signs of mania.  So

11  that would lead me to believe they're not attributing it to

12  a manic episode.  That's also a symptom of someone who has

13  Attention Deficit/Hyperactivity Disorder which he's been

14  diagnosed with and it seems like there's a lot of reference

15  to symptoms of AD/HD in the records as well.

16  BY MS. BENNETT:

17  Q.   Is that it?

18  A.   Yes, ma'am.

19  Q.   Can you tell me, what are the symptoms that are

20  generally associated with an Autism Spectrum Disorder?

21  A.   He was diagnosed with Asperger's disorder.  The

22  symptoms of Asperger's disorder included lack of interest in

23  engaging in social activities with peers, lack of -- or

24  failure to develop age-appropriate peer relationships,

25  repetitive or stereotype behaviors, stereotyped or -- I take

1    that back, not stereotyped.  Restricted range of interests.

2    Self stimulatory behavior which is where the repetitive

3    behavior comes in.  Difficulty interpreting social

4    interactions such as poor non-verbal communication skills

5    such as using and interpreting facial expressions, hand

6    gestures, difficulty interpreting social cues such as

7    personal space and sarcasm, things like that.  Those are

8    several of the symptoms.

9    Q.    Is it your testimony, then, that in reviewing the

10   Rocking Horse records you found that Mr. Skelton met none of

11   those symptoms?

12   A.    No, that's not what I said.

13   Q.    What symptoms did you find consistent with Mr. Skelton,

14   with an Asperger's diagnosis from the Rocking Horse records

15   that you reviewed?

16   A.    I don't recall reading any specific symptoms that

17   suggested Asperger's disorder to me in the records.  I'm

18   not -- my role in this was not to refute any other

19   clinician's diagnoses but when I read through the records, I

20   don't recall seeing specific symptoms of that disorder.  In

21   addition to that, I don't recall seeing specific symptoms in

22   combination.  So someone may have a symptom but that doesn't

23   mean they qualify for a diagnosis.  In addition to what was

24   in the records, my observations of Mr. Skelton, information

25   I got from his father, his father's responses on the GARs,

1    that in combination is how I came to my conclusion, my

2    opinion that at the time I saw him I felt like he did not

3    have the symptoms that were consistent with Asperger's

4    disorder.

5    Q.    You would agree if he is taking Haldol, Benztropine,

6    and Ativan that those medications would have contributed to

7    him not exhibiting symptoms of Asperger's, correct?

8    A.    Well, the records reflected he was prescribed those

9    medications.  I don't know if he was prescribed those

10   medications specifically to treat a disorder or one of the

11   other disorders they diagnosed him with.  I couldn't speak

12   specifically to how those medications may or may not have

13   been affecting his symptoms or lack thereof at the time that

14   I saw him.

15   Q.    You've just testified earlier those are medications

16   usually prescribed, Haldol it's prescribed to people who are

17   suffering from Autism Spectrum Disorder?

18   A.    I didn't say it was usually prescribed for that.  I

19   said I've known some clients who were prescribed that for

20   that condition.

21   Q.    It's used for that purpose?

22   A.    I have known cases where it has been, yes.  I don't

23   know if that's why his doctor at Rocking Horse was

24   prescribing that or not.  I couldn't speak to that.

25   Q.    You did not reach out to anybody at the Rocking Horse

1    to talk to them about why he was taking these medication,

2    why they have prescribed these for him and any differences

3    they had noticed in him since he started taking these

4    medications?

5    A.    That's correct.

6    Q.    Did you not believe that to be important?

7    A.    Not for the purpose of his competency to stand trial

8    and whether he suffered from a mental disease or defect that

9    would impair his ability to participate in the legal

10   proceedings and understand the legal proceedings.

11   Q.    I guess, doctor, you talk about, I did this because it

12   was not relevant for this purpose or that purpose.  What

13   relevance, then, would it have been for you to note in your

14   report that Mr. Skelton did not support a diagnosis of

15   Autism Spectrum Disorder?

16   A.    Well, because, if I have to make an opinion about

17   whether someone in my opinion has a mental disease or defect

18   that would affect their ability to do those tasks that I

19   just referenced, I feel that it is worth noting what

20   information I have of symptoms they've had, of symptoms they

21   currently have, of symptoms they report in the past, of

22   symptoms that they currently report in the past, to support

23   my decision.

24   Q.    So you, then, felt it was important for you to include

25   it for that reason but not to discuss that issue with his

1    prior treating physicians?

2    A.    That's correct.

3    Q.    Is it your testimony then that in your opinion a

4    diagnosis of an Autism Spectrum Disorder can be made simply

5    by this brief screening measure that you administered in

6    addition to your observations and your testing?

7    A.    It's my opinion that based on the scores of the GARs,

8    it didn't indicate -- and all the information that I had, it

9    didn't indicate that he had those symptoms.

10   Q.    But I guess what you did is sufficient for you to make

11   a statement?

12   A.    That he does not have those symptoms.

13   Q.    That's correct, that he does not suffer from an Autism

14   Spectrum Disorder?

15   A.    At the time that I saw him based on the information I

16   had, that's my opinion, correct, yes.

17   Q.    In the summary and opinion on page 9?

18   A.    Are you referring to my report?

19   Q.    Your report, I'm sorry.  You talk about, I guess, the

20   instrument that was used by Mr. Skelton's father to screen

21   for an Autism Spectrum Disorder.  You talk about the fact

22   that the rating suggests he has difficulty with social

23   interaction which is consistent with reports that he's

24   experienced social anxiety.  However he described his social

25   life to involve several friends and a girlfriend.  Is that

1    from Mr. Skelton's father or is that from Mr. Skelton about

2    the several friends and the girlfriend?

3    A.    Mr. Skelton told me that he had several friends and a

4    couple close friends when he was in school and that he had a

5    girlfriend in the past.  I don't remember exactly when that

6    was.  I don't remember if I noted that in my notes or not

7    but that he had a girlfriend.  And his father -- I didn't

8    ask his father about a girlfriend but his father confirmed

9    that he did have friends when he was in school and that he

10   socialized with his friends outside of school, spending time

11   at their houses, going to the mall, doing some of those

12   activities that Mister -- the Defendant Mr. Skelton told me

13   about.

14   Q.    Did you find any information in the Rocking Horse

15   records that was contradictory to those statements?

16   A.    I didn't look for that specific information in the

17   Rocking Horse records.

18   Q.    Would it be important for you to know whether or not

19   the Rocking Horse records had reflected something that was

20   contradictory to those statements, would that have made a

21   difference to you?

22   A.    I would say most likely only if there was something in

23   the Rocking Horse records that said his father said, and

24   then gave symptoms or gave conflicting information with what

25   he gave me, but his father seemed to be a reliable source of

1    information for his son's background, for the information I

2    was asking from him, and so I believed, I took what his

3    father told me to be true as far as his son's, the

4    information his son gave me about his social background.

5    Q.    If you'd turn to the last page of your report.  In the

6    second paragraph before the end, or I guess the second

7    paragraph from the top or bottom, whichever way you look at

8    it.  I'm looking at the very last sentence of that

9    paragraph.  You indicated, he understands the nature and

10   consequences of the proceedings da da da.  While he has a

11   history of mood disturbance, anxiety, and antisocial

12   attitudes, he did not exhibit any symptoms of mental disease

13   during the evaluation and he denied experiencing any

14   symptoms since starting his current medication regimen.

15   That was your statement there, correct?

16   A.    Yes, it's in the probation report.

17   Q.    Did you then I guess ask him about the symptoms he'd

18   experienced prior to starting his current medication

19   regimen?

20   A.    What I'm referring to there is not necessarily

21   immediately before he started.  It was just he had admitted

22   and it's pretty clear he had some symptoms of emotional

23   disturbance or mood disturbance.  He had problems -- he had

24   mental health problems in the past.  So in that sentence

25   what I'm referring to is that he has had mental health

1    problems in the past.  He reported to me that since taking

2    his current medication he has not had any of those problems.

3    He hadn't had problems with depression.  He hadn't had

4    problems with elevated mood.  He hadn't had any auditory or

5    visual hallucinogens or paranoia.  That's what I'm trying to

6    state in that sentence.

7    Q.    Those symptoms that he had indicated to you, I guess

8    the hallucinogens, the auditory, visual, whatever, paranoia,

9    are those symptoms that you found were substantiated by the

10   Rocking Horse records?

11   A.    Yes.

12         MS. BENNETT:  If I can have one moment, your

13   Honor?

14         THE COURT:  Of course.

15         MS. BENNETT:  Actually I just have one more

16   question, your Honor.

17   BY MS. BENNETT:

18   Q.    Dr. Kidd, in terms of Defendant's Exhibit B which is

19   the letter from the U.S. Attorney's office which you've

20   identified in your report under number 3 as U.S. Department

21   of Justice letter to Cheryll Bennett dated 8-13-15, I'm

22   assuming you reviewed that letter in preparing your report

23   also, correct?

24   A.    Correct.

25   Q.    You would agree with me, would you not, that that

1    letter also details behavior by Mr. Skelton which could be

2    consistent with bipolar disorder or an Autism Spectrum

3    Disorder?

4    A.    Could you be more specific?  Could you direct me to a

5    page?

6    Q.    Sure.  Let's take it one by one.  Let's take for

7    instance the first page under where it says, teacher one --

8    the second sentence, it says, teacher one advised that

9    Skelton was known to draw violent pictures and would talk

10   about the voices in his head.  Okay.  The second paragraph,

11   he would become frequently angry about things but there were

12   no overt acts of physical violence despite talking about it.

13   The last sentence of that paragraph, teacher one stated that

14   Skelton was angry at the world but nothing was directed at

15   teacher one at the school.  Would those statements cause you

16   any concern or cause you any kind of or make you believe

17   that those were related to any of the diagnoses Rocking

18   Horse had made pertaining to bipolar or Asperger's?

19   A.    Specifically just those two diagnoses, bipolar,

20   Asperger's?

21   Q.    Yes.

22   A.    I'm sorry, I need to read through the three areas you

23   directed me to.  (Witness examining document.)

24          So none of those three sentences that you read

25   would suggest symptoms of Asperger's disorder to me.

1    Drawing violent pictures is not a symptom of bipolar

2    disorder.  Voices in his head, if he was in a manic episode

3    with psychotic features, if it was a severe manic episode

4    with psychotic features, that could potentially suggest

5    bipolar disorder but to me it seemed fairly clear at least

6    from Mr. Skelton, his father, that those symptoms were

7    specific to the time period he was taking Abilify that he

8    hadn't experienced them before or after that medication, so

9    it led me to suspect that it may have been a side effect of

10    that medication.  But to answer your question, voices in his

11    head, if he was having psychotic symptoms, that can happen

12    during a bipolar disorder.  The next symptom, frequently

13    become angry about things, anger is not a symptom of

14    Asperger's disorder.  It's not a specific symptom of bipolar

15    disorder either.  Although symptoms when people are

16    experiencing elevated mood or the mood disturbance during a

17    manic episode or any mood disorder they can become angry.

18    People can become angry for a lot of other reasons too.  And

19    then he was angry at the world.  That's not a symptom of

20    bipolar disorder or Asperger's either.

21    Q.    If we turn to page 2, and I'm going to read it, if you

22    look at teacher three, she talks also about drawing the

23    pictures but I'm going to skip all of that since you've kind

24    of addressed that already.  If you go to the last paragraph,

25    the first paragraph on page 3, which is the last paragraph

1    pertaining to teacher three, in the last sentence she says,

2    teacher three recounted multiple incidents when Skelton

3    became extremely agitated during classes.  Then I'm going to

4    go back to the top.  Teacher three could tell when Skelton

5    was agitated.  He would need to remove himself from the

6    situation that was upsetting him at the time.  Whenever he

7    was agitated, he would come to teacher three and say what

8    was upsetting him.  Is that consistent with either of the

9    symptoms related to a diagnosis for bipolar or Asperger's?

10   A.    Agitation is not a symptom of Asperger's disorder.

11   Kind of like the anger, people can feel agitated or angry

12   for a number of different reasons.  Sometimes -- so

13   agitation, it could possibly be a symptom of bipolar

14   disorder, but it could also be a symptom of depression or

15   associated with depression, or a lot of times kids with

16   AD/HD experience agitation because of the frustration they

17   have with that.  So yes, potentially a symptom of bipolar

18   disorder but not Asperger's disorder.

19   Q.    Then if you go to -- I'm not going to talk about

20   teacher four because she repeats about the voices and the

21   pictures which you've addressed.

22         Teacher five at the bottom of page 3, she talks about

23   the fact that at one point in time, I'm looking at in middle

24   of the first paragraph, teacher five, at one point in time

25   before he withdrew from school, Skelton did an entire

1    project on slender man.  She was unfamiliar with slender man

2    but learned that he was a murderer.  She stated that Skelton

3    argued with teacher five about slender man.  She advised --

4    and I'm going to the next paragraph.  She advised that most

5    of Skelton's work was antisocial and she always believed

6    Skelton did the work for, quote, shock value.  Teacher five

7    goes on to say that his works were always violent and about

8    killing and that she advised that the art Skelton drew in

9    class frequently disturbed the other kids in the class.  She

10   described him as a loose canon.  And then she said she was

11   not surprised in learning he had assaulted the agents.  She

12   advised that Skelton's behavior began escalating prior to

13   his removal from school.  And he was becoming more volatile

14   in his interactions with women in the building.  Would any

15   of those statements there in your opinion be consistent with

16   bipolar or Asperger's.

17   A.   He did an entire project on Slender Man who was a

18   character that was, I'm assuming it was a character, I've

19   not heard of a real person named Slender Man, who was a

20   murderer.  Doing a school project on a murderer called

21   Slender Man is not a symptom of Asperger's disorder or

22   bipolar disorder.  His work was antisocial.  That's not a

23   symptom of Asperger's disorder or bipolar disorder.  He did

24   the work for shock value.  That's not a symptom of

25   Asperger's or bipolar disorder.  His works were always about

1    violent or killing.  Doing school projects or school

2    homework assignments about killing or violence is not a

3    symptom of Asperger's or bipolar disorder.  The art that he

4    drew in class frequently disturbed the other students.

5    That's a statement about the other students, not about Mr.

6    Skelton.  So I couldn't comment on that.  A loose canon, I'm

7    not sure what that refers to, so I couldn't speak to that.

8    She was not surprised to learn that he assaulted the agents.

9    Again, that's her emotional reaction to hearing about the

10   alleged offense, so I couldn't speak to that.  His behavior

11   began escalating prior to his removal from school.  I

12   couldn't speak to that because I'm not sure what they're

13   referring to as far as his behavior escalating.  Become more

14   volatile in his relations with women, I'm not sure what

15   they're referring to as far as being more volatile, but

16   there's no symptom of Asperger's disorder or bipolar

17   disorder that's specific to the way a client may interact

18   with females.

19   Q.   Is there anything about those statements that would

20   cause you concern about the mental stability of Mr. Skelton?

21   A.   Yes.  At the time that he was doing these things --

22   Q.   Yes.

23   A.   -- or currently?

24   Q.   Yes, at the time that these things were occurring.

25   A.   Yes.

1    Q.    Then if you, I'm going to turn your attention to the

2    last section there where they're talking to Mr. Skelton's

3    father and the father's girlfriend Kelly Blue.

4    A.    When you refer to the last section, could you direct

5    me?

6    Q.    Still on page 4.

7    A.    The last paragraph?

8    Q.    No, it's not a paragraph.  I'm talking about the entire

9    section that the Secret Service also interviewed Skelton's

10   father.  That entire section is detailing the interview that

11   secret service had with Skelton's father and Kelly Blue?

12   A.    Yes.

13   Q.    You reviewed that in preparing your report?

14   A.    Yes.

15   Q.    Can you tell me, on page 5 of that letter, in talking

16   with Miss Blue, she indicated -- she advised that Skelton

17   used to have a few friends who would come to the house to

18   visit.  However, she stated that Skelton argued so much with

19   his friends that most of them stopped coming around

20   approximately eight months ago.

21        Then at the last full paragraph of that page on page 5,

22   before it says if you have any questions or concerns, it's

23   stated it appears that they're talking at this point in time

24   now to Mr. Skelton's father.  When asked if Skelton had any

25   friends that he socialized with from school or work, Mr.

1    Skelton claimed that he has some friends at work but did not

2    identify them.  When asked about friends from high school,

3    Mr. Skelton did not identify anyone who Skelton was still in

4    contact with since he withdrew from school.  Did you read

5    that paragraph during the preparation of your report,

6    correct?

7    A.   Yes, I did.

8    Q.   So would you find that inconsistent with your statement

9    that Mr. Skelton -- with Mr. Skelton's father's statement

10   that indicates he had friends and socialized with his

11   friends and did all the stuff with friends?

12   A.   No, I would actually find it to be consistent with the

13   information his father gave me, the fact that he had friends

14   and that he currently did not -- that he had friends at

15   work, that's consistent with what they both told me.  That

16   the statement that he did not identify anyone who the

17   Defendant Mr. Skelton was still in contact with since he

18   withdrew from school is consistent with the Defendant Mr.

19   Skelton's explanation to me about some of the struggles he

20   was having prior to the alleged offense, so this is

21   consistent with what they told me.

22   Q.   But in your paragraph on page 9, where you're talking,

23   that last paragraph under Summary and Opinions, you've

24   indicated Mr. Skelton has difficulty in social interactions.

25   However, he described his social life to involve several

1    friends and a girlfriend, which you indicated that was

2    consistent with what the father had told you.  However, that

3    is not consistent with what the father indicated to the

4    Secret Service, would that be a fair statement?

5    A.    No, I don't think that's a fair statement.

6    Q.    So you believe that your statement about Mr. Skelton

7    having a social life which involved several friends and a

8    girlfriend is consistent with what Mr. Skelton's father told

9    the secret service about the fact that he had friends from

10   work and school but he couldn't identify any?

11   A.    There are two different periods of time.

12   Q.    What period of time are you referring to?

13   A.    I'm referring to historically, that there were points

14   in time when he had friends and that he had a girlfriend and

15   that he would socialize with his friends outside of school

16   doing at least some activities that were fairly typical for

17   individuals his age.  He had told me, over the course of the

18   evaluation, that he had lost contact with those friends

19   after high school because the friends got busy and so they,

20   he no longer had contact with them.  So when I make my

21   statement on page 9 of my report that you're referring to,

22   it's just a general statement that he has had friends and a

23   girlfriend, not the current state of his social life.  What

24   I understand his father to be referring to is when he says

25   he did not identify anyone who Skelton was still in contact

1    with since he withdrew from school is -- since he withdrew

2    from school which is kind of current and a specific time

3    period.  That is consistent with what the Defendant Mr.

4    Skelton told me, that he lost contact with his school

5    friends since they graduated from high school.  So the

6    information that I got during my evaluation is consistent

7    with the information that was provided in this paragraph

8    you're referring to in the agent's, Mr. Hunt's report.

9    Q.    Letter?

10   A.    Letter.

11   Q.    Just one last question.  Then the next statement which

12   says, his father did not endorse childhood symptoms of

13   autism?

14   A.    Can you direct me?

15   Q.    Of your report.  I'm still looking at the last

16   paragraph of your report, page 9.  That same paragraph that

17   we were just reading.  I'm just reading the next sentence.

18   A.    I see it, thank you.

19   Q.    Right.  It says his father did not endorse childhood

20   symptoms of autism.  In your opinion, your review of the

21   Rocking Horse records was consistent with the father's

22   report?

23   A.    Again, I don't recall seeing specific symptoms of

24   Asperger's disorder in the Rocking Horse records or at least

25   a list of symptoms that in totality supported the diagnosis.

1    I'm not necessary -- that would support that diagnosis.  I

2    don't recall seeing that in writing in those records.

3    Q.   Okay.

4         MS. BENNETT:  I don't believe I have anything

5    else, your Honor, thank you.

6         THE COURT:  Thank you, Ms. Bennett.  Mr. Hunt,

7    will there be any redirect?

8         MR. HUNT:  Just very briefly.  I won't belabor

9    this.

10        THE COURT:  If I might ask one or two questions

11   prior to your redirect.

12        MR. HUNT:  Yes, sir.

13        THE COURT:  Doctor, these questions will be

14   unartfully worded but to the extent you can answer them I'll

15   ask that you do so within reasonable psychological

16   certainty.

17        THE WITNESS:  Yes, your Honor.

18        THE COURT:  Would a finding of bipolar as to Mr.

19   Skelton or anyone else in and of itself make a person not

20   competent to stand trial or would such a finding depend upon

21   A the diagnosis and other factors?

22        THE WITNESS:  It would not necessarily in and of

23   itself mean that someone is unable to participate in the

24   proceedings or understand the proceedings.  It would depend

25   on what symptoms, the specific symptoms they were

1    experiencing, to what degree they were experiencing those

2    symptoms and how those symptoms may or may not impact their

3    ability to understand the process and assist their counsel

4    in their defense.

5            THE COURT:  When you say experiencing symptoms,

6    you mean at the time you are examining the person,

7    evaluating the person for competency, not necessarily at

8    some point in the historical past?

9            THE WITNESS:  That's correct.

10           THE COURT:  I would ask the same question, does a

11   diagnosis of Autism Spectrum Disorder in and of itself make

12   a person not competent to stand trial or does it depend upon

13   other factors?

14           THE WITNESS:  It would not exclusively make

15   someone incompetent to stand trial.  It would depend, again,

16   on the symptoms and how those symptoms may or may not be

17   impacting the ability to understand the process, appreciate

18   the process, and assist in their defense.

19           THE COURT:  Again, experiencing symptoms as of the

20   date of the competency evaluation, not necessarily in the

21   historical past.

22           THE WITNESS:  That's correct.

23           THE COURT:  Of course, as Ms. Bennett has pointed

24   out, symptoms experienced in the past are relevant evidence

25   but not dispositive of a present evaluation.

1          THE WITNESS:  That's correct.

2          THE COURT:  Would a finding of Asperger's syndrome

3    in and of itself render a person incompetent to stand trial

4    or would that simply be one of many other variables?

5          THE WITNESS:  So Asperger's disorder is a type of

6    Autism Spectrum Disorder.  So I would give the same answer

7    as Autism Spectrum Disorder that as with the diagnosis of

8    Asperger's disorder would not in and of itself mean that

9    someone is unable to participate in their defense or

10   understand the legal process in their particular case.  And

11   it would depend on their symptoms and how it would affect

12   their ability to understand and -- understand that process.

13         THE COURT:  As of the time of the evaluation, not

14   necessarily the symptoms being experienced in the past.

15         THE WITNESS:  Correct.

16         THE COURT:  But as Ms. Bennett points out, past

17   symptomatology certainly has some relevance.

18         THE WITNESS:  Correct.

19         THE COURT:  I think you've already answered this

20   but that's never deterred me in the past.  I'm assuming that

21   a person can be competent one day and perhaps a week to 10

22   days later might not be, depending upon the symptoms being

23   experienced, is that accurate?

24         THE WITNESS:  Yes, that is possible.

25         THE COURT:  I assume -- well, my assumption isn't

1   relevant.  Let me turn to Mr. Hunt.  If Ms. Bennett has any

2   follow up, that will be fine.  I would only ask counsel not

3   to represent "just one more question."  Mr. Hunt.

4           MR. HUNT:  Yes, sir.

5                   REDIRECT EXAMINATION

6   BY MR. HUNT:

7   Q.    Dr. Kidd, among the tests you gave to the Defendant as

8   part of this evaluation, was the Georgia competency test?  I

9   may have used an improper term.  The Georgia Core Competency

10  Test?

11  A.    It's a competency screening instrument.

12  Q.    Generally, is that a test where you identify parties

13  and the role of the process for a criminal case?

14  A.    That's part of it.

15  Q.    Just in general, what does the test cover?

16  A.    That particular instrument covers where individuals sit

17  in the courtroom, what those individuals do, and that

18  includes the judge, the jury, prosecutor, defense attorney,

19  witnesses, and the Defendant.  So what their function is in

20  the process.  It asks, if they can identify ways to contact

21  their attorney, their attorney's name, how they can help in

22  their defense.  It asks questions about whether they

23  understand what their charge is, if they can identify their

24  charge, the meaning of those charges, whether they

25  understand the potential sentence for those charges and

1   whether they can provide, from their perspective, an

2   explanation of the alleged offense.

3   Q.   Is that a widely-accepted psychological tool in this

4   evaluation process?

5   A.   Yes.

6   Q.   Given on multiple occasions in evaluations in the past?

7   A.   Yes.

8   Q.   You indicated in your report that 70 or higher suggests

9   competence?

10  A.   That is not a hard cutoff score but it is, generally

11  speaking, a score that you look for.  I ask additional

12  questions because the Georgia alone I feel is not sufficient

13  to assess competency.  It's more for factual competency.  So

14  I would not render an opinion solely based on their score or

15  solely based on those 20 or so questions on the Georgia.  It

16  is one factor that I consider.

17  Q.   In other words, you'd use the score plus other things?

18  A.   Plus other questions that I ask, yes.

19  Q.   He scored a 94 on the test when you gave it to him?

20  A.   That's correct.

21  Q.   An average person who walks in off the street, what

22  kinds of numbers would you expect to see?

23  A.   I've never given the test to an average person that

24  walks in off the street.  But obviously out of a hundred,

25  that's pretty good.  So there's a total of 50 points.  You

1    double it to come up with a hundred.  So his score was

2    actually a 47 out of 50, so that's pretty high.

3    Q.    Notwithstanding any past issues he may have had

4    regarding symptoms of autism or Asperger's, thing of that

5    nature, he was able to appropriately answer questions you

6    asked along with this test?

7    A.    Yes.

8    Q.    In light of the fact you were evaluating him as he sat

9    presently with you when you were evaluating him, was it your

10   opinion, then, the fact that he is competent to understand

11   the process against him and to assist in his defense, to a

12   reasonable degree of psychological certainty?

13   A.    It's my opinion that at the time I saw him that he was

14   capable of understanding that.  He expressed understanding

15   and appreciation for the legal process and that he was able

16   to show that he was capable of assisting in his defense.

17            MR. HUNT:  No further questions, Judge.

18            THE COURT:  Thank you, Mr. Hunt.  Ms. Bennett,

19   further cross.

20            MS. BENNETT:  Can I have one second please, your

21   Honor?

22            THE COURT:  Yes.

23            MS. BENNETT:  Nothing further, your Honor, thank

24   you.

25            THE COURT:  Doctor, I want to thank you for your

1    time.  I have a follow-up question or two which hopefully

2    will avoid your having to return.  Keep in mind that at this

3    point Mr. Skelton is unadjudicated.  He's neither been

4    judged guilty or not guilty and for all I know the ultimate

5    result might be the latter.  So the question I'm asking you

6    to answer, if you can within reasonable psychological

7    certainty, is to assume that Mr. Skelton presents himself to

8    you either through court order or as a voluntary patient.

9    Is he in need of psychological services based on your

10   evaluation of him?

11           THE WITNESS:  I wouldn't feel comfortable

12   answering that question because my focus in conducting my

13   evaluation was on the specific legal -- being able to answer

14   the specific legal questions pertaining to the reason for

15   the referrals.

16           THE COURT:  I fully understand that.  Am I correct

17   that in a normal assessment as to whether someone needs your

18   services or not, and if so the type, extent, duration, et

19   cetera, obviously your focus would be different but would

20   your questions and method of evaluation be different?

21           THE WITNESS:  I would say, generally speaking, I

22   would ask a lot of the same type of questions and, generally

23   speaking, my approach would be similar.

24           THE COURT:  Let me tell you what I'm getting at.

25   That may be helpful.  I don't know what's going to happen in

1    Mr. Skelton's case.  If he's found not guilty, certainly I

2    have no power to order Mr. Skelton to treatment.  With that

3    in mind, then, let's assume the other possibility, that he's

4    found guilty or pleads guilty.  What I'm trying to determine

5    is how he can be helped without your having to come back

6    here in to court to testify again.  That's my purpose.  If

7    you cannot answer the question, I certainly understand.  Or

8    if you'd rather not answer the question.

9           THE WITNESS:  I guess the best way I could answer

10   that question is if I were to be subpoenaed again to be

11   brought in and asked questions similar to the ones you're

12   asking me now about treatment, I would answer them the same

13   way, unless I was asked to do a separate evaluation where

14   that was my focus, but I would answer it the same way

15   because I would be basing my answer on the same information

16   I have now with the same perspective I have now.

17          THE COURT:  And the same focus that you have now.

18          THE WITNESS:  Correct.  So I would still feel

19   uncomfortable offering any kind of opinion or statement

20   about Mr. Skelton specifically and what his current

21   treatment needs may or may not be.  More generally speaking,

22   just looking at the nature of the alleged offense and some

23   of the things that I understand may lead up to someone

24   engaging in that type of behavior, I would in general think

25   that mental health treatment would be helpful for that

1    person and that the person would probably benefit from some

2    type of counseling or other mental health services.

3              THE COURT:  I'm comfortable with your answer.  I

4    appreciate it.  Mr. Hunt, any follow up?

5              MR. HUNT:  No, your Honor, thank you.

6              THE COURT:  Ms. Bennett?

7              MS. BENNETT:  No, your Honor, thank you.

8              THE COURT:  Doctor, thank you for your time, sir.

9    Ms. Bennett, have you given any further consideration in the

10   light of what we've heard this morning as to whether you

11   will be calling an additional witness?

12             MS. BENNETT:  Judge, can I have one second?

13             THE COURT:  Yes.

14             MS. BENNETT:  Judge, I don't know that I would

15   call a witness for purposes of whether or not Mr. Skelton is

16   or isn't competent.  However, I think down the road I will

17   probably call a witness to talk about Mr. Skelton's mental

18   health and his diagnoses, his symptoms and that kind of

19   information.  So I'm not sure if it would be better for me

20   to wait or to bring someone in now to talk about those

21   issues, some of which would probably be in conflict with

22   what Dr. Kidd has just testified to.

23             THE COURT:  I can't answer that question, only you

24   can.  It depends on your strategy from this time forward.  I

25   am more than happy to not pressure you for an answer today

1     but I certainly can't tell you how to proceed with your

2     case.

3             MS. BENNETT:  Judge, if we could maybe delay.  Mr.

4     Hunt and I are going to be talking about this case in the

5     very, very near future.  I suspect that within a short while

6     I should be able to say whether or not we'd like to put

7     someone on now or maybe a little further down the road.

8             THE COURT:  At a different procedural stage?

9             MS. BENNETT:  That's correct, your Honor.

10            THE COURT:  All right.  Then what I'll do, Ms.

11    Bennett, we could wait till we talk on November 10th which

12    really is just around the corner, so please advise me on

13    November 10th.  If there's another witness on this issue,

14    certainly I'll hear that witness.  If there's not, then I'll

15    make a ruling.  It would be very helpful if you would take

16    no more than five minutes to tell me your perspective on

17    this issue.  Certainly I followed your examination.  I know

18    that you're trying to point out that Rocking Horse reported

19    certain symptoms that Dr. Kidd did not consider -- withdraw

20    that.  Rocking Horse reported certain symptoms that formed

21    the basis of its diagnoses that Dr. Kidd did not consider to

22    be as significant.  Is that the gist of your argument?

23            MS. BENNETT:  It is, your Honor, and it's our

24    opinion that Dr. Kidd has, in his report, pretty much tried

25    to contradict the diagnoses that was made by the Rocking

1    Horse center, and we believe that that diagnosis is

2    legitimate based on the records from the Rocking Horse and

3    just based on the other material that we have in this case

4    which Dr. Kidd also reviewed.  So that would be the point.

5         THE COURT:  Then I think in fairness to your

6    client whether you choose to call another witness or not, I

7    need you to give a brief oral argument.  Certainly, Mr.

8    Hunt, I'll hear from the government.  Keep in mind -- and I

9    need you to cite chapter and verse.  Keep in mind Dr. Kidd

10   indicated that even the Rocking Horse diagnoses in and of

11   themselves would not be dispositive.  So I need you to point

12   out the other variables that confirm the accuracy of the

13   Rocking Horse diagnoses and in doing so rebut that of Dr.

14   Kidd.  So when we talk on the 10th what I would like to do

15   is to set a brief period of time for an oral argument.

16        MS. BENNETT:  Certainly, your Honor, that would be

17   great, thank you.

18        THE COURT:  Mr. Hunt, anything further?

19        MR. HUNT:  No, your Honor, thank you.

20        THE COURT:  You're welcome.  Ms. Bennett?

21        MS. BENNETT:  No, your Honor, thank you.

22        THE COURT:  You're welcome.  We are both in

23   recess.

24        (Proceedings recessed at 12:45 p.m.)

25                IN THE CONFERENCE ROOM

1                        12:47 p.m.

2              MR. HUNT:  I have just a housekeeping matter.  I

3       don't think we actually did it on the record.  We would be

4       moving to admit Government Exhibit 1, the report.  I don't

5       know if it was necessary to have a stipulation or not, but

6       to the extent it's necessary, we'd tender him as an expert

7       witness.

8              THE COURT:  I don't think it's necessary to tender

9       him.  Obviously you called him as an expert witness.  If

10      Cheryll had any objection, she would have challenged his

11      qualifications.  That's my procedure, such as it is.  If it

12      gives you any comfort, do you have any objection to his

13      expertise?

14             MS. BENNETT:  None, your Honor.

15             THE COURT:  All right.  So tendered.

16         Any objection to Government Exhibit Number 1 which is

17      really already a part of the record?  Cheryll?

18             MS. BENNETT:  No, your Honor.

19             THE COURT:  Admitted without objection.  I do have

20      an objection to Cheryll's Exhibit A or number 1.  What I'd

21      like you to do, and it's a lot of work and I apologize,

22      instead of admitting that two-inch thick stack of documents,

23      pull out what you've used -- I think that will make a better

24      record -- label it, was it A or was it one?

25             MS. BENNETT:  It was A, Judge.

1     THE COURT:  Then simply indicate each page as A-1,

2  A-2, A-3.

3     MS. BENNETT:  Judge, the only issue I have with

4  that, I actually had more than those pages tabbed.  I just

5  didn't go into them.  I figured he had the entire stack of

6  records that he relied on to prepare the report that I would

7  just maybe cite to certain instances that I didn't

8  specifically get into.

9     THE COURT:  The problem is, yeah, he said he

10  reviewed the report.  But absent any testimony about them,

11  I'm not sure they have any relevance to this hearing.

12     MS. BENNETT:  Okay.

13     THE COURT:  Let's handle it in this way.  Do you

14  have any objection generically to Cheryll's two Exhibits?

15     MR. HUNT:  No.

16     THE COURT:  Exhibit B which is Andrew's letter of

17  course is admitted without objection.  Maybe the best way to

18  handle this is to make two packets, Exhibit A, Exhibit A-1.

19  Exhibit A is everything.  Exhibit A-1 will include just

20  those documents to which you referred.  That way your record

21  is preserved.

22     MS. BENNETT:  Certainly, your Honor.

23     THE COURT:  Fair enough.

24     MS. BENNETT:  Sounds good.

25     THE COURT:  Andrew, anything else?

1     MR. HUNT:  I'm sorry.  I didn't bring this up

2  sooner.

3     THE COURT:  Frankly you shouldn't have to bring it

4  up.  That's the Judge's job.  Amy, anything?

5     MS. SMITH:  No, your Honor.

6     THE COURT:  Cheryll?

7     MS. BENNETT:  No, your Honor.

8     THE COURT:  We're in recess.

9     (Proceedings concluded at 12:51 p.m.)

10                    - - -

11              C-E-R-T-I-F-I-C-A-T-E

12     I, Debra Lynn Futrell, Notary Public in and

13  for the State of Ohio at large,

14     Do Hereby Certify that the foregoing pages

15  are a true and correct transcription of my stenographic

16  notes taken of the proceedings held in the afore-captioned

17  matter before the Honorable Walter H. Rice, Senior District

18  Judge, to the best of my ability.

19

20     S/Debra Lynn Futrell
       _____
21     Debra Lynn Futrell, RMR-CRR
       Notary Public, State of Ohio
22     My Commission Expires 12-27-18

23

24

25